Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL III

| | | |
|---|---|---|
| CONSEJO DE TITULARES DEL CONDOMINIO VILLAS DE PASEOSOL<br><br>Apelados<br><br>v.<br><br>LUIS GILBERTO CABRERA MEDINA, CARMELINA ÁLVAREZ GIBOYEAUX, SOCIEDAD LEGAL DE BIENES GANANCIALES CABRERA-ÁLVAREZ<br><br>Apelantes | TA2026AP00407 | *Certiorari* **acogido como APELACIÓN** procedente del Tribunal de Primer Instancia, Sala Superior de San Juan<br><br>Caso núm.: SJ2024CV04082 (504)<br><br>Sobre: Cobro de Dinero |

Panel integrado por su presidente el juez Hernández Sánchez, el juez Rivera Torres y el juez Marrero Guerrero

**Rivera Torres, Juez Ponente**

**SENTENCIA**

En San Juan, Puerto Rico, a 28 de mayo de 2026.

Comparece ante este tribunal apelativo, el Sr. Luis Gilberto Cabrera Medina, la Sra. Carmelina Álvarez Giboyeaux, y la Sociedad Legal de Bienes Gananciales compuesta por ambos (en adelante, los apelantes) mediante el recurso de apelación[1] de epígrafe solicitándonos que revisemos la *Sentencia Parcial* emitida el 6 de octubre de 2025 por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI), notificada ese mismo día. Mediante este dictamen, el foro primario concluyó que no procede la reclamación por daños incluida en la *Reconvención* instada por los apelantes. Además, decretó que se continúen con los procedimientos para atender la reclamación de cobro de dinero.

Por los fundamentos que expondremos a continuación, confirmamos el dictamen apelado.

**I.**

El 6 de mayo de 2024, el Consejo de Titulares (Consejo o apelado) presentó demanda sobre cobro de dinero en contra de los

---

[1] Mediante nuestra *Resolución* emitida el 22 de abril de 2026 acogimos el recurso como uno de apelación.

apelantes. Se alegó que el 1 de diciembre de 1997, estos adquirieron la Villa 19-B del Condominio Villas de Paseosol, el cual está sujeto al régimen de propiedad horizontal. Por lo que, una vez se convirtieron en dueños, los apelantes se obligaron a contribuir proporcionalmente a los gastos para la administración, conservación y reparación de los elementos comunes generales del Condominio, así como a los gastos del seguro de las facilidades comunes. Se adujo que la cuota de mantenimiento que le corresponde a la Villa 19-B del Condominio es $106.13 mensuales. Se señaló que, desde el julio de 2021, los apelantes han incumplido con su obligación de satisfacer las cuotas de mantenimiento, así como las penalidades establecidas en la Ley 129 de 16 de agosto de 2020, según enmendada, conocida como la "*Ley de Condominios de Puerto Rico*", *infra*, y el pago del seguro comunal. Por ello, a los apelantes se le cursó una carta de cobro, por correo certificado, requiriéndole el pago de $6,669.36 de cuotas de mantenimiento vencidas, penalidades estatutarias y primas adeudas del seguro comunal. Al 1 de abril de 2024 dicha cantidad incrementó a $6,885.29, la cual aumenta a razón de una cantidad mínima mensual de $161.83, pero los apelantes han ignorado todas las gestiones de cobro. Por lo que, se le solicitó al TPI imponga a los apelantes el pago del monto reclamado más una cuantía por concepto de honorarios de abogado por temeridad y las costas del litigio.

El 24 de septiembre de 2024, los apelantes instaron *Contestación a Demanda y Reconvención*.[2] Entre sus alegaciones se encuentra de que se dejó de satisfacer las cuotas de mantenimiento desde que el Consejo intervino ilegalmente con el contador de la Autoridad de Acueductos y Alcantarillados (AAA) y colocó un

---

[2] Véase, el Sistema Unificado de Manejo y Administración de Casos del Tribunal de Primera Instancia (SUMAC TPI), Entrada núm. 10.

candado en el contador de la luz, lo que provocó daños a la propiedad. En la *Reconvención* adujeron que las actuaciones ilegales del Consejo han entorpecido de manera flagrante con el uso, disfrute y seguridad de su vivienda y, además, al intervenir con los servicios privados de agua y electricidad le ha causado un daño que se estima en $10,000.

El 10 de diciembre de 2024 el Consejo le solicitó al tribunal primario permiso para enmendar la demanda para incluir que los apelantes alquilaron la Villa 19-B y reconectaron los servicios que le fueron suspendidos sin contar con la autorización de la Junta de Directores.[3] Por lo que, se peticionó invocar el derecho que le asiste al Consejo de Titulares para que en su causa de acción en cobro de dinero se aplique la penalidad estatutaria que provee el Artículo 59 de la *Ley de Condominios de Puerto Rico, infra,* en concepto de una suma ascendiente al triple de las cuantías adeudadas. El foro primario accedió a la solicitud, más concedió término a los apelantes para contestar la misma.

El Consejo solicitó la desestimación de la Reconvención, lo cual fue denegado por el TPI en la Resolución Interlocutoria emitida el 22 de enero de 2025 y notificada al día siguiente. Este dictamen fue objeto de revisión ante nos, KLCE202500183, en el que un Panel Hermano denegó el recurso al determinar que no encontró criterios para intervenir con lo resuelto.[4]

El 10 de febrero de 2025 el Consejo contestó la Reconvención[5] y expuso que conforme a la Escritura Matriz el área de los conectores para los servicios públicos de agua, luz, alcantarillado, teléfonos y cable TV se designó como elementos comunes generales. Además,

---

[3] SUMAC TPI, Entradas núms. 25 y 33.
[4] SUMAC TPI, Entradas núms. 66 y 82. *Resolución* del 18 de marzo de 2025.
[5] SUMAC TPI, Entrada núm. 39.

negaron las alegaciones del pedido, así como se reiteró en las alegaciones de la demanda.

El 17 de febrero de 2025 los apelantes instaron *Contestación a Primera Demanda Enmendada, Defensas Afirmativas y Reconvención*.[6] Allí, reiteraron sus alegaciones y defensas, y expusieron que, en la demanda enmendada del 17 de enero de 2025, el Consejo, por vez primera, admite que ellos desconectaron el contador de la AEE, el que es privado y privativo, y solo le da servicio a su residencia. Por lo que, reafirmaron que el contador de la AEE no es un elemento común y precisaron que la corporación pública les factura a ellos y han pagado el servicio por 27 años. En la Reconvención, aumentaron en $25,000 los daños por las molestias causadas por el Consejo. El TPI tomó por no puesta esta Reconvención enmendada en respuesta a un pedido del Consejo de desglosar la misma ante el incumplimiento de los apelantes con el previo permiso al tribunal para dicho proceder.[7]

Luego de varios trámites procesales, y en lo que nos concierne, el 11 de marzo de 2025 los apelantes presentaron *Moción en Solicitud de Sentencia Sumaria Parcial Relativa al Contador de Energía Eléctrica*.[8] En esta, se detallaron cincuenta y ocho (58) hechos incontrovertidos, los que, a su entender, permiten al TPI resolver el caso sumariamente.[9] A su vez, estos precisaron, entre otros argumentos, que:

> Y ya se sabe, porque ha quedado ampliamente demostrado, que la parte demandante-reconvenida. 1) no posee evidencia alguna para inequívocamente evidenciar que "el suministro del servicio de energía eléctrica (o AAA) que llega a la propiedad de los demandados-reconvenientes, en uno u otro caso proviene de un "elemento común general del inmueble", y sí aparece registrado en la escritura matriz de dicho inmueble; cuando por el contrario, y por las sendas certificaciones expedidas por AEE como por AAA se evidencia que tanto el suministro de energía eléctrica como el de acueductos provienen de una instalación

---

[6] SUMAC TPI, Entrada núm. 46.
[7] SUMAC TPI, Entradas núms. 47, 50 y 52.
[8] SUMAC TPI, Entrada núm. 59.
[9] *Íd.*, a las págs. 3-20.

independiente, individual, privada y asignada personalmente la misma – con especificidad de número de contador, número de cuenta, ubicación, a quién se le da servicio y factura por el mismo y desde cuándo.

Estos acompañaron el pedido con los siguientes documentos: foto del contador de luz, Certificación expedida por LUMA, factura de electricidad para el periodo del 7 de febrero al 8 de marzo de 2024, Certificación de Servicios emitida por la AAA, Carta del Lcdo. Francisco J. Rodríguez Mora del 17 de octubre de 2023; correos electrónicos, mensajes de texto de los abogados, carta suscrita por el Lcdo. Francisco J. Rodríguez Mora del 18 de noviembre de 2024, y Reglamento del Consejo de Titulares del Condominio Villas Paseosol.

El 17 de marzo de 2025, mediante Resolución Interlocutoria, el foro apelado acogió únicamente la contestación a demanda enmendada incoada por los apelantes.[10]

Por su parte, el 31 de marzo de 2025 el Consejo instó la oposición al petitorio desestimatorio sumario parcial de los apelantes.[11] Mediante este escrito, el apelado enumeró siete (7) asuntos en controversia. Asimismo, estableció como controvertidos los hechos núms. 3, 10, 11, 13, 19, 23, 24, 25 y 26 propuestos por los apelados en su solicitud. Además, el Consejo propuso diecinueve (19) hechos que no están controvertidos, lo que resultan suficientes para denegar la moción del pedido sumario de los apelantes.[12] Entre los argumentos se encuentran que: el escrito de los apelantes demuestra un craso incumplimiento con los requisitos que consagran las Reglas 36.1 y 36.3 de las de Procedimiento Civil *infra*; la moción no contiene declaraciones juradas en donde se establezca la veracidad de los hechos y documentos sobre los que se alega no existe controversia, contiene meras alegaciones y, peor aún,

---

[10] SUMAC TPI, Entrada núm. 62.
[11] SUMAC TPI, Entrada núm. 67.
[12] *Íd.*, a las págs. 12-16.

contiene múltiples documentos en apoyo generados por su representación legal; los *Exhibits* núms. 8 a 19, son comunicaciones entre los abogados de las partes dirigidas a llegar a un acuerdo extrajudicial las que no son admisibles bajo la Reglas 408 de las Reglas de Evidencia; en el *Exhibit* núm. 20 de la moción de sentencia sumaria, los apelantes incluyeron un reglamento del Condominio Paseosol el cual no tiene fecha en que fue aprobando ni obra en escritura pública; los apelantes no han establecido su derecho con claridad sobre la supuesta ilegalidad del corte de servicios de electricidad y agua; no han indicado cuándo surgió la causa de acción de daños y perjuicios, a pesar de que el Consejo levantó la defensa de prescripción; es un asunto en controversia si apelantes interrumpieron oportunamente el término prescriptivo para incoar la reclamación de daños y perjuicios; y la Escritura Matriz del Condominio claramente establece que los "[c]onectores para los servicios públicos de agua, luz, alcantarillados, teléfonos y Cable TV" y los "[c]imientos, paredes maestras y de carga, tanto internos como externos, techos, el vuelo y vías de entrada y salida o comunicación" son elementos comunes generales.

El escrito se acompañó de los siguientes documentos: Escritura Matriz Núm. 348 Estableciendo Régimen de Propiedad Horizontal del Condominio Villas de Paseosol otorgada el 22 de agosto de 1994, factura del 11 de abril de 2024, carta de cobro del 29 de marzo de 2022, acuse de correo certificado, correo electrónico del 13 de mayo de 2022, correo electrónico del 18 de agosto de 2022 y foto del contador de la luz.

El 1 de abril de 2025 se celebró *Conferencia sobre el estado de los procedimientos* y de la *Minuta*[13] surge que el tribunal permitió a los apelantes instar la Reconvención enmendada y concedió término

---

[13] SUMAC TPI, Entrada núm. 71.

al Consejo para la presentación de la oposición, así como a las partes para la réplica y la dúplica relativas a la moción de sentencia sumaria incoada por los apelantes.

En cumplimiento con lo ordenado, los apelantes instaron la réplica a la oposición[14] del Consejo en la que refirmaron que la villa es "una estructura independiente, a nivel de la calle, con su propio garaje de entrada para autos, su propio balcón de entrada; sus propias terrazas –un primer piso de la villa, otra en el tercer piso. De igual forma está particularizada porque, y como hemos enfatizado, con su propio, particular e individualizado contador de energía eléctrica y contador de agua." Señalaron que cada villa posee un contador de energía eléctrica independiente, ya que no existe un solo contador desde el cual se le supla y trasmite de energía eléctrica a cada residencia. De haberlo, tendría que estar registrado por la AEE a nombre del Consejo. Por lo que, se especificó que:

> AEE, en su momento, colocó un contador con su interruptor principal (breaker) en la propiedad-villa-objeto de la controversia; cuando y para finales de 1997, la parte demandada-reconvenida adquiere la villa, somete a AEE toda la documentación pertinente para que se le proveyera del servicio de energía eléctrica a su vivienda. Cumplimentado los trámites y prestada la fianza, la AEE activó en diciembre de 1997, y, para Luis Cabrera Medina, como cliente con número de cuenta 3177722000 (Anejo II, Certificación Electrónica Oficial de LUMA, Anejo III, facturas de LUMA), el servicio por medio del contador independiente e individualizado: NXC 214045 0316.
>
> Desde ese entonces se perfeccionó entre AEE y la parte demandada reconveniente [apelantes] un contrato de servicios. Contrato de servicios sobre el cual nadie más, absolutamente nadie más, tiene poder alguno de in[j]erencia e intervención.

El 28 de abril de 2025 el Consejo instó la dúplica[15] a la referida réplica en donde se expuso que "[c]iertamente en los autos no obra ni una sola pieza de evidencia que demuestre que la AEE llevó a cabo dos (2) actos; primero, la instalación del contador y,

---

[14] SUMAC TPI, Entrada núm. 72.  Se anejó al escrito varias fotografías, Certificación y factura emitidas por LUMA.
[15] SUMAC TPI, Entrada núm. 79.

segundo, la instalación del breaker (interruptor principal)". En el escrito, el apelado recalcó que:

> 14. Como cuestión de hecho y derecho, los demandados CABRERA-ÁLVAREZ no han podido refutar que, conforme a la Escritura Matriz del Cond. Villas de Paseosol, los conectores de los servicios públicos de agua y energía eléctrica del condominio son elementos comunes generales los cuales, conforme a las disposiciones del Artículo 59 de la Ley 129-2020, 31 L.P.R.A. § 1923d, el aquí compareciente tiene derecho a intervenir para suspenderle a aquellos titulares morosos los servicios de agua potable, electricidad, entre otros.
>
> 15. Resulta así inconsecuente toda alegación de los codemandados CABRERA-ÁLVAREZ en cuanto a las disposiciones reglamentarias de la Autoridad de Energía Eléctrica, en su fútil intento de sostener reclamaciones que no operan bajo el régimen de propiedad horizontal que opera en el Cond. Villas de Paseosol.

Así las cosas y analizados los antedichos escritos, el 6 de octubre de 2025 el foro apelado emitió y notificó la *Sentencia Parcial* impugnada en la que esbozó las siguientes determinaciones de hechos incontrovertidos:[16]

> 1. El 22 de agosto de 1994, UNICOURTS, S.E., suscribió la escritura pública núm. 348, intitulada *Escritura matriz estableciendo régimen de propiedad horizontal del Condominio Villas de Paseosol* ante el notario Edwin Rosa Nova.
>
> 2. Conforme a la *Escritura Matriz,* el Condominio Villas de Paseosol está sometido al régimen de propiedad horizontal. En lo pertinente, se dispuso lo siguiente:
>
>> ---SÉPTIMO: "EL PROPIETARIO" por la presente somete el proyecto antes descrito, denominado "VILLAS DE PASEOSOL", a la Ley de Propiedad Horizontal y cualesquiera otras leyes sobre la materia, y lo organiza en un Régimen de Propiedad Horizontal, el cual se regirá por las disposiciones de dichas leyes, por esta escritura y por lo dispuesto en el Reglamento, el cual se hace formar parte de esta escritura como Anejo A, y por los acuerdos válidos que puedan ser adoptados por el Consejo de Titulares y la Junta de Directores del Condominio.
>
> 3. Conforme a la Escritura Matriz, se consideran elementos comunes generales del Condominio los siguientes:
>
>> a) Las calles privadas que dan acceso a las propiedades, así como los estacionamientos de visitantes.
>>
>> b) Conectores para los servicios públicos de agua, luz, alcantarillados, teléfonos y Cable TV.

---

[16] SUMAC TPI, Entrada núm. 90, a las págs. 7-11. Notas al calce omitidas. Asimismo, el foro apelado consignó los siguientes dos (2) hechos en controversia:
1. Si se cumplió el procedimiento requerido por la Ley Núm. 29-2020, *supra,* para la desconexión de los servicios.
2. Si los esposos Cabrera-Álvarez reconectaron o no los servicios, sin autorización del Consejo de Titulares, luego de habérselos desconectado.

c) Sistema e instalaciones de electricidad en las áreas comunes.

d) Sistema e instalaciones sanitarias, de agua drenaje pluvial en las áreas comunes.

e) Cercas, muros, jardineras y verjas que limitan el perímetro del solar.

f) La Parcela de terreno en la cual enclava el complejo y sus muros medianeros y/o exteriores.

g) Áreas para la basura, localizadas a la entrada de las calles privadas.

h) Áreas para los buzones.

i) Cimientos, paredes maestras y de carga tanto internos como externos, techos, el vuelo, vías de entrada y salida o comunicación.

j) Portones eléctricos de entrada y salida al CONDOMINIO y sus instalaciones.

k) Todo lo demás que fuere racionalmente de uso común del inmueble o necesario para su existencia, conservación, disfrute, seguridad y adecuado uso.

l) Luminarias en la marquesina y las paredes exteriores de las unidades.

4. Conforme a la *Escritura Matriz*, se consideran *elementos comunes limitados* del Condominio los siguientes:

   a) Ventanas y puertas exteriores de cada villa con sus respetivos marcos.

   b) Los patios delanteros, posteriores o laterales, según sea el caso, de las villas de los edificios, los cuales se mencionan en las descripciones de las villas.

   En este acto el Propietario asigna a cada unidad el uso exclusivo de sus patios.

   c) Buzones para correspondencia para el uso exclusivo de la villa o villas o personas con cuyo número o nombre se identifique cada buzón.

   d) Cualquier área que no caiga bajo la definición de elementos comunes limitados o privados se considerará parte de los elementos comunes generales.

5. El 1 de diciembre de 1997, los esposos Cabrera-Álvarez adquirieron la Villa 19-B del Edificio 4 del Condominio mediante escritura de compraventa núm. 6 otorgada ante el notario Carlos A. Vilches López.

6. La descripción registral de la Villa 19-B del Condominio es la siguiente:

   --PROPIEDAD HORIZONTAL: Villa número diecinueve b (19-B) del Condominio Villas de Paseosol, Edificio número cuatro (4), situado en Boulevard de la fuente, Urbanización Paseos, en el Barrio Cupey, del término municipal de San Juan, Puerto Rico. Esta villa de vivienda está fabricada de concreto refinado. Está constituido de tres (3) niveles que se señalan a continuación, siendo el primer (1er) piso, el piso terreno con su puerta de entrada por el lindero Este y por ella se sale al área de circulación que conduce al exterior. Est[a] villa tiene un área total aproximada de doscientos cuarenta y cinco punto noventa y uno metros cuadrados (245.91 m.c.). Linderos: por el NORTE, en

cincuenta y cinco pies pulgadas (55'5"), equivalentes a dieciséis puntos noventa metros lineales (16.90 m.l.), con pared medianera que lo separa de la Villa dieciocho A (18-A), área de uso común limitado y área exterior común. Por el SUR, en cincuenta y cinco pies cinco pulgadas (55'5"), equivalentes a dieciséis puntos noventa metros lineados (16.90 m.l.), con pared medianera que lo separa de la Villa veinte B (20-B), pasillo que conduce a la Villa, área de circulación y área exterior común. Por el ESTE, en veintitrés pies seis pulgadas (23'6"), equivalentes a siete puntos dieciséis metros lineales (7.16 m.l.) con la calle y pasillo que conduce a la villa. Por el OESTE, en veintitrés pies seis pulgadas (23'6"), equivalentes a siete puntos dieciséis metros lineales (7.16 m/l.) con área de uso común limitado. Est[a] villa consta en su primer nivel de cocina, sala, comedor, patio interior, área de escalera que conduce al segundo (2do) y tercer (3er) piso, vestíbulo de entrada, baño y marquesina. El segundo nivel consta de dos dormitorios, tres closets, baño, laundry, área de escalera que conduce al primer (1er) y tercer (3er) piso, "family room"; dormitorio master, baño master y closet vestidor. El tercer (3er) piso consta de terraza, "sun deck" y escalera que conduce al segundo (2do) y primer (1er) piso. Esta villa goza del uso exclusivo de un patio que es elemento común limitado, el cual está delimitado por verjas según surge de los planos del proyecto. A est[a] villa le corresponden estacionamientos localizados en la marquesina de dicha villa con acceso por la calle del condominio. A esta villa le corresponde una participación de uno punto nueve mil ciento cincuenta y nueve por ciento (1.9159%) en los elementos comunes del condominio. El 7 de junio de 2007, siguiendo los preceptos establecidos en los *by-laws* de la parte demandante Asociación, la Junta de Directores aprobó la imposición de una penalidad de $100.00 por concepto de recargo a todo titular que no pague sus cuotas de mantenimiento a los 61 días de vencidas.

--Inscrita al folio 182 del tomo 615 de Rio Piedras Sur, finca núm. 19370.-------

7. Los esposos Cabrera-Álvarez se convirtieron en miembros del Consejo de Titulares en el momento en que adquirieron la Villa 19-B del Condominio.

8. En el momento en que los esposos Cabrera-Álvarez adquirieron la Villa 19-B del Condominio, se obligaron a contribuir proporcionalmente a los gastos para la administración, conservación y reparación de los elementos comunes generales del Condominio, así como a los gastos del seguro de las facilidades comunes. En lo pertinente, el Artículo 99 del *Reglamento del Condominio* dispone lo siguiente:

**Artículo 99. Pago de Cuotas de Mantenimiento**. Todo titular viene obligado al pago de la contribución proporcional que le corresponde a su villa a base del por ciento de participación que se establece en la Escritura Matriz para la administración, el mantenimiento y conservación de los elementos comunes generales de condominio, y en caso de que aplique, de los elementos comunes limitados, así como todos aquellos que fuesen legítimamente acordados.

9. El *Reglamento del Condominio* regula todo lo relacionado al pago de las cuotas y el corte de servicio.

En lo pertinente, el Capítulo XIV del Reglamento dispone lo siguiente:

**Artículo 100. Prohibición de Retener Cuotas de Mantenimiento**. Ningún titular podrá retener el pago de la cuota de mantenimiento, bajo pretexto de que no recibe los servicios comunales o que está en contra de las decisiones tomadas por la Junta de Directores o el Consejo de Titulares.

**Artículo 101. Fecha de Pago. Vencimiento. Cargos.** El pago de la cuota de mantenimiento será exigible por adelantado los días primero (1ero) de cada mes. No obstante, los titulares podrán efectuar el pago de sus cuotas durante los primeros quince (15) días de cada mes sin penalidad. A partir del día decimosexto (16) de cada mes, se impondrá una penalidad de un diez por ciento (10%) de la totalidad de la deuda. La falta de pago de tres (3) o más plazos, con llevará una penalidad adicional equivalente al uno por ciento (1%) mensual del total adeudado.

**Artículo 104. Corte de Servicios**. La Junta de Directores y/o al Agente Administrador quedan facultados para que se suspenda el servicio de agua potable, electricidad, gas, teléfono, así como los servicios de transmisión de voz, video y data, y/o cualquier otro servicio similar, cuando el suministro de éstos llega por medio de instalaciones que constituyen elementos comunes generales del inmueble, a aquellos titulares que adeuden dos (2) o más plazos de cuotas, cuotas especiales, derramas, multas con pago vencido de sesenta (60) días o más, o alguna prima vencida del seguro comunal por cualquiera de las villas de los que sea titular.

Todo corte de servicio se llevará a cabo previa notificación al titular moroso con no menos de quince (15) días de anticipación a la fecha del corte de servicio. La notificación aquí indicada se llevará a cabo de la misma forma en la cual el titular moroso tiene derecho a ser notificado de las convocatorias a asambleas.

Los servicios serán restituidos una vez se pague el total de la cantidad adeudada.

[...]

**Artículo 106. Plan de Pago Previo al Corte de Servicios.** La Junta de Directores deberá evaluar junto con el titular, dentro de los quince (15) días de notificación de corte de servicios, un plan de pago en los casos en que el titular demuestre que sus ingresos o capacidad de pago han disminuido. Para ello el titular deberá presentar evidencia de sus ingresos por el periodo de tiempo que compone seis (6) meses antes del primer mes adeudado hasta el mes en que solicite el plan de pago. La Junta de Directores podrá requerirle al titular, y éste quedará obligado a, que presente una declaración jurada a los efectos de acreditar que sus ingresos o capacidad de pago han disminuido. El primer incumplimiento de un plan de pago aprobado por la Junta de Directores tendrá la consecuencia del corte de servicio sin notificación previa.

**Artículo 107. Forma del Corte de Servicios.** El corte de los servicios deberá hacerse durante horas laborables, de lunes a jueves, de forma que cualquier titular pueda acudir de inmediato a las oficinas de la Administración o comunicarse con el Tesorero en caso de no haber Agente Administrador y saldar su deuda mediante cheque de gerente, giro

postal o en efectivo. En ningún caso se aceptarán pagos por cheques personales de titulares morosos que adeuden dos (2) o más meses por concepto de cuotas de mantenimiento.

[...]

**Artículo 109. Penalidad por Reconexión de Servicios Suspendido.** El titular u ocupante a quien se le hayan suspendido cualesquiera de los servicios comunales que, sin la autorización de la Junta de Directores o del Agente Administrador, por sí o a través de tercero se reconecte a dichos servicios, o de cualquier otra forma se sirva de las facilidades comunes de las cuales ha sido privado, incurrirá en una penalidad ascendente al triple de las sumas adeudadas, incluidos el principal y los intereses.

**Artículo 110. Honorarios por Cobro de Dinero.** Cuando sea preciso recurrir al Tribunal en cobro de dinero por atraso en el pago de las cuotas de mantenimiento, del seguro comunal, de multas o de derramas, los titulares aceptan y consienten que estarán obligados a satisfacerle al Consejo de Titulares los gastos y costas que imponga el foro competente, así como la cantidad de treinta por ciento (30%) del total adjudicado por sentencia. En caso de que el titular no satisfaga el pago de honoraros junto con el pago de la suma por sentencia, la cantidad adeudada se prorrateará en dos (2) plazos que formarán parte de la cuota de mantenimiento para todos los propósitos que contempla la ley.

10. Entre los deberes y facultades de la Junta de Directores del Condominio, según se dispone en el Artículo 63 del *Reglamento del Condominio*, se encuentran los siguientes:

    a. Atender todo lo relacionado con el buen gobierno, administración, vigilancia y funcionamiento del Régimen y en especial lo relativo a las costas y elementos de uso común y los servicios generales, y hacer a estos efectos las oportunas advertencias y apercibimientos a los titulares.

    [...]

    d. Cumplir y hacer cumplir las disposiciones de la Ley de Condominios de Puerto Rico, el Reglamento, la Escritura Matriz y los acuerdos del Consejo de Titulares.

    [...]

    j. Ordenar que se suspendan los servicios recibidos a través o por medio de los elementos comunes generales, incluidos los servicios de agua, gas, electricidad, teléfono, internet y/o cualquier otro servicio similar a éstos, a aquellos condóminos morosos, conforme lo requerido por ley.

11. Según la Certificación Electrónica Oficial de LUMA emitida el 20 de diciembre de 2024, el apartamento 19 del Condominio Villas de Paseosol contiene un contador de energía eléctrica identificado con el núm. NCX2140450316.

12. Asimismo, en la Certificación Núm. CC-24-12-03586 aparece el nombre de Luis G. Cabrera Medina en la Información del Cliente con el número de cuenta asignado 3177722000.

13. Según la Certificación de servicios de la Autoridad de Acueductos y Alcantarillas (AAA), 12 de febrero de 2025, aparece el nombre de Luis G. Cabrera Medina con el número de cuenta asignado 000215579996.

14. Los esposos Cabrera-Álvarez dejaron de satisfacer las cuotas de mantenimiento.

15. En la carta fechada 29 de marzo de 2022 dirigida a Luis Cabrera, se le informó que su cuenta reflejaba un balance pendiente por la cantidad de $5,199.11 por concepto de cuotas de mantenimientos de 2020-2021, seguro comunal de 2021-2022, derrama de pintura en 2021 y cargos por demora. Además, se le informó que debían comunicarse con la oficina de administración del Condominio en el término de quince (15) días para gestionar un plan de pago y así evitar que el caso fuera referido a legal y se desconectaran los servicios de agua y electricidad.

16. El 13 de marzo de 2022, mediante correo electrónico Doris Rosales, representante Property Collector & Access informó que estaría realizando la desconexión de los servicios el 16 de mayo de 2022.

17. El 18 de agosto de 2022, mediante correo electrónico Jailienid Olmo, representante de Property Collector Access informó que se rompió una parte del contador de energía eléctrica para activar la luz.

18. Según la factura núm. 2024-19 emitida el 11 de abril de 2024 por el Consejo de Titulares, desde el mes de julio de 2021, los esposos Cabrera-Álvarez han incumplido con su obligación de satisfacer las cuotas de mantenimiento de la Villa 19-B del Condominio, incluyendo las penalidades establecidas en el Artículo 59 de la Ley Núm. 129-2020.

A base de dichas determinaciones de hechos, el TPI concluyó lo siguiente:[17]

> En vista de lo anterior, no hay duda de que, una vez los esposos Cabrera-Álvarez adquirieron la propiedad—Villa 19-B—se obligaron a contribuir proporcionalmente al pago de gastos mantenimiento de los elementos comunes generales y limitados del inmueble. Según se desprende del expediente, la cuota por concepto de mantenimiento correspondiente a la Villa 19- B del Condominio ascendía a $106.13 mensuales. Era obligación de los esposos Cabrera-Álvarez efectuar el pago de la cuota entre el día uno (1) y el día quince (15) de cada mes, de manera que no incurrieran en penalidad alguna.
>
> […].
>
> Según la factura núm. 2024-19, los esposos Cabrera-Álvarez incumplieron con el pago de las cuotas mensuales de mantenimiento a partir de julio de 2021. De hecho, los propios esposos Cabrera-Álvarez admitieron que dejaron de satisfacer el pago de la cuota de mantenimiento. Ello así, ante el incumplimiento de pago dentro de los primeros quince (15) días de cada mes a partir de julio de 2021, a cada cuota mensual adeudada de $106.13 le aplica la penalidad de diez por ciento (10%). Asimismo, a falta de pago de tres (3) o más plazos, se añade una penalidad

---

[17] *Íd.*, a las págs. 19-21.

adicional de un por ciento (1%) mensual del total adeudado.

Es menester señalar que, conforme al *Reglamento del Condominio*, la Junta de Directores tiene el deber de "cumplir y hacer cumplir las disposiciones de la Ley de Condominios de Puerto Rico, el Reglamento, la Escritura Matriz y los acuerdos del Consejo de Titulares". Asimismo, entre sus deberes y facultades, se le reconoce a la Junta de Directores la facultad de "ordenar que se suspendan los servicios recibidos a través o por medio de los elementos comunes generales, incluidos los servicios de agua, gas, electricidad, teléfono, internet /o cualquier otro servicio similar a éstos, a aquellos condóminos morosos, conforme lo requerido por ley". Al igual que lo dispuesto en el *Reglamento del Condominio*, la propia Ley Núm. 129-2020, *supra*, reconoce a la Junta de Directores la potestad de ordenar la suspensión del servicio de agua potable y electricidad, a aquellos titulares que adeuden dos (2) o más plazos de cuotas. (31 LPRA sec. 1923d). Lo anterior procede si "el suministro de éstos llega por medio de instalaciones que constituyen elementos comunes generales del inmueble". *Íd*. Para ello resulta necesario acudir a la definición de lo que *son elementos comunes generales del inmueble*, según la Ley de Condominios, *supra*.

Conforme antes esbozado, el Artículo 3(j) de la Ley de Condominios, *supra*, define los elementos comunes como "elementos que no son susceptibles de propiedad individual por los titulares y sujetos a un régimen de indivisión forzosa". (31 LPRA sec. 1921b(j)). El Artículo 17 de la Ley de Condominios, *supra*, contiene un listado de lo que se consideran *elementos comunes generales*. Sin embargo, reconocemos que dicha lista no es taxativa. *Trigo Margarida v. Junta Directores, supra*. Lo determinante es que aparezca en la escritura matriz las áreas o elementos que se clasifican como elementos comunes generales del inmueble. Esto debido a que se requiere que en la escritura se exprese claramente el destino y uso de toda área comprendida en el inmueble. (31 LPRA sec. 1921c).

Al examinar la *Escritura Matriz* encontramos que se dispuso un listado de áreas que se considerarían como *elementos comunes generales* del Condominio Villas de Paseosol. Entre ellos se encuentran los siguientes:

b) Conectores para los servicios públicos de agua, luz, alcantarillados, teléfonos y Cable TV.

[…]

f) La Parcela de terreno en la cual [enclava] el complejo y sus muros medianeros y/o exteriores.

[…]

i) Cimientos, paredes maestras y de carga tanto internos como externos, techos, el vuelo, vías de entrada y salida o comunicación.

De lo anterior se desprende que el conector de servicio público de electricidad se identificó como un elemento común general del Condominio, al igual que la parcela de terreno donde enclava el complejo, así como las paredes maestras y de cargas, tanto internas como externas. Los esposos Cabrera-Álvarez insisten en que el contador de energía eléctrica, al servirle solo a su propiedad— la Villa 19-B—y estar ubicado dicho contador en ella, tiene carácter privado. A esto añaden que tanto la factura de la luz como el agua viene a nombre de Luis Cabrera y no a

nombre del Consejo de Titulares. Aun cuando se reconoce que el servicio se le brinda de manera particularizada a la propiedad de los esposos Cabrera Álvarez, no es menos cierto que para que estos disfruten de los servicios de energía eléctrica, se requiere que el conector de servicio público de luz—considerado un elemento común general del Condominio—les suministre a los esposos Cabrera-Álvarez la energía que servirá a su propiedad a través del contador de la AEE.

Siendo el conector de servicio público el medio que suministra la energía eléctrica de la cual finalmente se sirven los esposos Cabrera-Álvarez, es evidente que se cumple con lo establecido en el Artículo 59 de la Ley de Condominios, *supra*. A saber, los servicios de energía eléctrica utilizados por los esposos Cabrera-Álvarez son suministrados por una instalación que constituye un elemento común general. Por lo tanto, contrario a lo alegado por los esposos Cabrera Álvarez, la Junta de Directores del Condominio sí tenía autoridad para suspenderle los servicios de energía eléctrica.

Por tanto, el TPI dictaminó que:[18]

De este modo, concluimos que no procede la reclamación por daños instada por los esposos Cabrera-Álvarez. La intervención de la Junta de Directores no fue ilegal. Por el contrario, la propia Ley de Condominios, *supra*, así como el *Reglamento del Condominio Villas de Paseoso*l faculta a la Junta de Directores a ordenar la suspensión de la desconexión de los servicios cuando hay incumplimiento en el pago de cuotas de mantenimientos y los servicios de los cuales se sirven los titulares son suministrados por medio de instalaciones consideradas elementos comunes generales del inmueble. En el presente caso, no hay duda de que los esposos Cabrera-Álvarez incumplieron con dos (2) o más plazos del pago de la cuota de mantenimiento ni que se servían de energía eléctrica que era suministrada por medio de un elemento común general del Condominio.

Ahora bien, consideramos que existen hechos sobre los cuales aún existen controversias y los cuales nos impiden resolver la reclamación sobre cobro de dinero. Primero, si la carta de cobro de dinero enviada a la dirección de los esposos Cabrera-Álvarez por correo certificado fue recibida. No obra en el expediente prueba del acuse de recibo de dicha carta. Por el contrario, se desprende que, al 5 de abril de 2022, la última gestión realizada fue hacer entrega de la carta al agente que haría la entrega final. No hay indicios que dicho documento se le haya entregado a los esposos Cabrera-Álvarez. Tampoco queda claramente establecida la fecha en que se llevó a cabo la desconexión de los servicios. De esta manera, se desconoce si se cumplió con el procedimiento requerido por la Ley Núm. 129-2020, *supra*, para la desconexión de los servicios.

Segundo, existe controversia sobre si los esposos Cabrera-Álvarez reconectaron o no el servicio eléctrico de la Villa 19-B a fines de imponérsele la penalidad que provee la Ley de Condominios, *supra*. Es decir, si se le impone una penalidad que asciende al triple de las sumas adeudadas por reconectar, sin la autorización de la Junta,

---

[18] *Íd.*, a las págs. 21-22.

los servicios cualesquiera de los servicios comunales que fueron desconectados.

A tenor con lo anterior, procede que se continúen con los procedimientos a los fines de determinar si se cumplió con el procedimiento previo a la desconexión de los servicios conforme exige la Ley Núm. 129-2020, *supra*, y, además, si procede imponer la penalidad del triple de las sumas adeudas, según provee el Artículo 59 de la Ley de Condominios, *supra*.

El 20 de octubre de 2025 el Consejo instó moción de reconsideración en la que peticionó que el tribunal hiciera una determinación de temeridad y le impusiera a los apelantes resarcir al organismo $10,000 en honorarios de abogados por dicho concepto. Los apelantes se opusieron a este pedido. El 20 de marzo de 2026 el foro *a quo* emitió Resolución Interlocutoria declarando No Ha Lugar al referido petitorio.

En desacuerdo con la *Sentencia Parcial* recurrida, los apelantes acuden ante esta *Curia* mediante recurso de apelación imputándole al tribunal primario haber incurrido en los siguientes errores:

COMETI[Ó] GRAV[Í]SIMO ERROR EL HONORABLE TRIBUNAL DE INSTANCIA AL DESESTIMAR LA RECONVENCI[Ó]N PRESENTADA POR LA PARTE DEMANDADA RECONVENIENTE-APELANTE, BAJO LA DETERMINACI[Ó]N DE QUE TANTO EL CONTADOR DE LA AUTORIDAD DE ENERG[Í]A EL[É]CTRICA Y EL CONTADOR DE LA AUTORIDAD DE ACUEDUCTOS Y ALCANTARILLADOS, LOS CUALES EST[Á]N A NOMBRE DE LOS DEMANDADOS-RECONVENIENTES-APELANTES, SE ENCUENTRAN DENTRO DE LA PROPIEDAD DE LOS DEMANDADOS-RECOVENIENTES-APELANTES Y CUYAS FACTURAS SON PAGADAS POR LOS DEMANDADOS-RECONVENIENTES-APELANTES, SON ELEMENTOS COMUNES DE LA PARTE DEMANDANTE-RECONVENIDA-APELADA.

COMETI[Ó] GRAV[Í]SIMO ERROR EL HONORABLE TRIBUNAL DE INSTANCIA, AL DETERMINAR QUE LA PARTE DEMANDANTE-RECONVENIDA-APELADA TENÍA LA AUTORIDAD PARA INTERFERIR CON EL CONTADOR DE ENERGÍA ELÉCTRICA (O EL DE AGUA) DE LA PROPIEDAD DE LA PARTE DEMANDADA-RECONVENIENTEAPELANTE, LOS CUALES NO SON, NI NUNCA HAN SIDO DESDE EL 1997 "ELEMENTOS COMUNES GENERALES DEL INMUEBLE".

El 22 de abril de 2026 emitimos *Resolución* concediendo a la parte apelada hasta el 21 de mayo de 2026 para expresarse. El 8 de mayo de 2026 se cumplió con lo ordenado por lo que, mediante

la *Resolución* del 12 de mayo, nos dimos por cumplidos y a su vez, decretamos perfeccionado el recurso.

Analizados los escritos de las partes y el expediente apelativo, así como estudiado el derecho aplicable, procedemos a resolver.

## II.

**Mecanismo de Sentencia Sumaria**

En nuestro ordenamiento jurídico, el mecanismo de la sentencia sumaria está gobernado por la Regla 36 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 36, la cual autoriza a los tribunales a dictar sentencia de forma sumaria si, mediante declaraciones juradas u otro tipo de prueba, se demuestra la inexistencia de una controversia sustancial de hechos esenciales y pertinentes. *Soto y otros v. Sky Caterers*, 2025 TSPR 3, 215 DPR ___ (2025); *Cruz, López v. Casa Bella y otros*, 213 DPR 980, 993 (2024) Específicamente, la Regla 36.1, 32 LPRA Ap. V, R. 36.1, atiende la solicitud de este tipo de disposición a favor de la parte reclamante en un pleito, mientras que la Regla 36.2, 32 LPRA Ap. V, R. 36.2, permite su petición a favor de la parte contra la que se reclama. En ambas reglas se establece lo siguiente:

> **Regla 36.1. A favor de la parte reclamante**
>
> Una parte que solicite un remedio podrá presentar, ..., una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación solicitada.
>
> **Regla 36.2. A favor de la parte contra quien se reclama**
>
> Una parte contra la cual se haya formulado una reclamación podrá presentar, ..., una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación.

Entretanto, la Regla 36.3, 32 LPRA Ap. V, R. 36.3, dispone los requisitos de contenido de la moción de sentencia sumaria y de la

contestación a esta, entre otras particularidades del procedimiento. Estos requisitos, como los párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, no son un mero formalismo, ni constituye un simple requisito mecánico sin sentido. *SLG Zapata-Rivera v. J.F. Montalvo,* 189 DPR 414, 434 (2013).

En un primer plano, mediante el uso del mecanismo discrecional de la sentencia sumaria, se aligera la tramitación de un caso, puesto que, ante la ausencia de controversia de hechos, al tribunal solo le corresponde aplicar el derecho. *Oriental Bank v. Perapi et al.,* 192 DPR 7, 25 (2014). Así, sirve para propiciar la solución justa, rápida y económica de los litigios civiles que no presentan controversias genuinas de hechos materiales y que, por lo tanto, no requieren la celebración de un juicio en su fondo, ya que lo único que resta es dirimir una o varias controversias de derecho. *Íd.*

Este tipo de resolución procede en aquellos casos en los que no existen controversias **reales y sustanciales** en cuanto a los **hechos materiales y, por lo tanto, lo único que resta es aplicar el derecho**. *Consejo Tit. v. Rocca Dev. Corp.*, et als., 215 DPR ___, 2025 TSPR 6 (2025); *Meléndez González et al. v. M. Cuebas,* 193 DPR 100, 109 (2015). La precitada Regla 36 de las de Procedimiento Civil, *supra,* dispone, en esencia que, para permitir este tipo de adjudicación, resulta necesario, que de las alegaciones, deposiciones, contestaciones a interrogatorios, admisiones, declaraciones juradas y cualquier otra evidencia surja de que no existe controversia real y sustancial, respecto a ningún hecho esencial y pertinente; y en adición, que se deba dictar sentencia sumaria como cuestión de derecho. *Consejo Tit. v. Rocca Dev. Corp., et als.,* supra; *Meléndez González et al. v. M. Cuebas*, supra, a la pág. 109. En este sentido, solo procede dictarla cuando surge de manera

clara que, ante los hechos materiales no controvertidos, el promovido no puede prevalecer ante el derecho aplicable y que el tribunal cuenta con la verdad de todos los hechos necesarios para resolver la controversia. *Meléndez González et al. v. M. Cuebas*, supra, a las págs. 109-110.

Es decir, por un lado, al promovente de la moción le toca establecer su derecho con claridad y demostrar que no existe controversia en cuanto a ningún hecho material, o sea ningún componente de la causa de acción. *Íd.*, a la pág. 110. Por el otro, al oponente le corresponde establecer que existe una controversia que sea real en cuanto a algún hecho material y, en ese sentido, no cualquier duda es suficiente para derrotar la solicitud de sentencia sumaria. *Íd.* Cabe recordar que, en este contexto, un hecho material es aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable. *Íd.* Mas específicamente, el oponente debe controvertir la prueba presentada y no debe cruzarse de brazos; pues de lo contrario, se expone a que se acoja la solicitud de sentencia sumaria y se le dicte en contra. *Ramos Pérez v. Univisión,* 178 DPR 200, 214-215 (2010). Esto significa que está obligado a contestar de forma detallada y específica aquellos hechos pertinentes que demuestran la existencia de una controversia real y sustancial que requiere dilucidarse en un juicio. *Íd.*, a la pág. 215. En este ejercicio, debe presentar declaraciones juradas o documentos que pongan en controversia los hechos alegados por el promovente, recordando que tampoco puede descansar en meras alegaciones, sino que debe proveer evidencia sustancial de los hechos materiales en disputa. *Íd.* No obstante, no oponerse a la solicitud de sentencia sumaria no implica ni que procederá dictarla obligatoriamente, si existe una controversia legítima sobre un hecho material, ni que corresponderá dictarla a favor de su proponente si no procede en derecho. *Íd.*

Ahora bien, se han establecido ciertas reglas limitantes de la discreción en el uso de la moción de sentencia sumaria. Por un lado, la determinación en cuanto a esta debe guiarse por un principio de liberalidad a favor de la parte que se opone, lo cual persigue evitar la privación del derecho de todo litigante a su día en corte cuando existen controversias de hechos legítimas y sustanciales que deben ser resueltas. *Íd.*, a las págs. 216-217. Por el otro, como norma general, los tribunales están impedidos de dictar sentencia sumaria en cuatro instancias: (1) cuando existan hechos materiales y esenciales controvertidos; (2) cuando hay alegaciones afirmativas en la demanda que no han sido refutadas; (3) cuando de los propios documentos que acompañan la moción surge que existe una controversia sobre algún hecho material y esencial; o (4) cuando como cuestión de derecho no procede. *Oriental Bank v. Perapi*, supra, a las págs. 26-27. Dicho esto, cabe indicar que la moción de sentencia sumaria no está excluida en ningún tipo de pleito, puesto que, sin importar cuán complejo sea un pleito, puede dictarse si de una moción de sentencia sumaria bien fundamentada surge que no hay controversia sobre hechos materiales. *Meléndez González et al. v. M. Cuebas*, supra, a la pág. 112.

En lo relativo al ejercicio de la facultad revisora de este Tribunal de Apelaciones, sobre la procedencia de la sentencia sumaria, debemos utilizar los mismos criterios que el Tribunal de Primera Instancia. *Meléndez González et al. v. M. Cuebas*, supra, a la pág. 115. En *Meléndez González,* el Tribunal Supremo consignó el siguiente estándar:

> Primero, reafirmamos lo que establecimos en *Vera v. Dr. Bravo, supra*, a saber: el Tribunal de Apelaciones se encuentra en la misma posición del Tribunal de Primera Instancia al momento de revisar Solicitudes de Sentencia Sumaria. En ese sentido, está regido por la Regla 36 de Procedimiento Civil, *supra*, y aplicará los mismos criterios que esa regla y la jurisprudencia le exigen al foro primario. Obviamente, el foro apelativo intermedio estará limitado en cuanto a que no puede tomar en consideración evidencia que las partes no presentaron ante el Tribunal

de Primera Instancia **y tampoco adjudicar los hechos materiales en controversia, ya que ello le compete al foro primario luego de celebrado un juicio en su fondo**. La revisión del Tribunal de Apelaciones es de *novo* y debe examinar el expediente de la manera más favorable hacia la parte que se opuso a la Moción de Sentencia Sumaria en el foro primario, llevando a cabo todas las inferencias permisibles a su favor.

Segundo, por estar en la misma posición que el foro primario, el Tribunal de Apelaciones debe revisar que tanto la Moción de Sentencia Sumaria como su Oposición **cumplan con los requisitos de forma codificados en la Regla 36 de Procedimiento Civi**l, supra, y discutidos en *SLG Zapata-Rivera v. J.F. Montalvo*, supra.

Tercero, **en el caso de revisión de una Sentencia dictada sumariamente**, el Tribunal de Apelaciones **debe revisar si en realidad existen hechos materiales en controversia**. De haberlos, el foro apelativo intermedio tiene que cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil y debe exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos. Esta determinación se puede hacer en la Sentencia que disponga del caso y puede hacer referencia al listado numerado de hechos incontrovertidos que emitió el foro primario en su Sentencia.

Cuarto y, por último, de encontrar que los hechos materiales realmente están incontrovertidos, el foro apelativo intermedio procederá entonces a revisar de *novo* si el Tribunal de Primera Instancia **aplicó correctamente el Derecho a la controversia**.” (Énfasis nuestro). *Meléndez González et al. v. M. Cuebas*, supra, a las págs. 118-119.

Por último, esta norma ha sido reiterada año tras año por nuestro Tribunal Supremo, en donde ha establecido que los foros apelativos nos encontramos en la misma posición que los foros de primera instancia al evaluar la procedencia de una **sentencia sumaria**. *Soto y otros v. Sky Caterers*, supra; *Cruz, López v. Casa Bella y otros*, supra; *Birriel Colón v. Econo y otro*, 2023 TSPR 120, 213 DPR 80, 91-92 (2023). Sin embargo, nuestra función se limita a: (1) considerar los documentos que se presentaron ante el foro de primera instancia; (2) determinar si existe alguna controversia genuina de hechos materiales y esenciales, y (3) comprobar si el derecho se aplicó de forma correcta. *Íd.* Cónsono a ello, también se ha establecido que los tribunales revisores estamos llamados a examinar el expediente *de novo* de la manera más favorable hacia la parte que se opone a la solicitud de sentencia sumaria en el foro

primario y realizando todas las inferencias permisibles a su favor. *Soto y otros v. Sky Caterers*, supra; *Birriel Colón v. Econo y otro*, supra, a las págs. 91-92*.*

**Propiedad Horizontal**

El Régimen de Propiedad Horizontal se ha concebido en nuestro ordenamiento jurídico como una figura jurídica que transforma una estructura física en múltiples estructuras jurídicas, para que donde antes cabía un sólo dominio, ahora puedan coexistir varios. *Serrano Muñoz v. Auxilio Mutuo*, 171 DPR 717, 757 (2007). "Desde sus inicios, "[l]a aprobación de la Ley de la Propiedad Horizontal adelantó el propósito de armonizar el disfrute de cada apartamento por su titular y las limitaciones a ese disfrute en interés de la colectividad". *D.A.Co. v. Junta Cond. Sandy Hills*, 169 DPR 586, 597 (2006). En otras palabras, subyace en estos preceptos la necesidad imperiosa de crear "unas reglas mínimas para el uso y disfrute de cada apartamento" que "facilit[en] la convivencia entre los titulares de un inmueble, sin que se intervenga indebidamente con los derechos individuales de los demás". *Junta Dir. Cond. Montebello v. Torres*, 138 DPR 150, 154 (1995)". *Batista, Nobbe v. Jta. Directores*, 185 DPR 206, 218 (2012).

El 16 de agosto de 2020, la Asamblea Legislativa aprobó la Ley núm. 129, denominada como la *Ley de Condominios de Puerto Rico*, 31 LPRA sec. 1291 *et seq.* (Ley núm. 129-2020)[19] La misma se aprobó con el fin de actualizar las normas que rigen la convivencia en los condominios y atemperar la norma estatutaria a cambios sociológicos experimentados en el país. *Exposición de Motivos* de la Ley núm. 129-2020.

En lo concerniente a la controversia que nos ocupa, una estructura puede ser sometida al régimen horizontal solo mediante

---

[19] Este estatuto derogó la Ley núm. 104 de 23 de junio de 1958 conocida como la "Ley de Condominios".

escritura pública, la cual deberá ser inscrita en el Registro de la Propiedad. *Consejo de Titulares Cond. McKinley Court v. Rullán*, 126 DPR 387 (1990); *García Larrinua v. Lichtig*, 118 DPR 120 (1986). La escritura matriz expresará clara y precisamente el uso a que será destinada toda área comprendida en el inmueble sometido al régimen de propiedad horizontal y, una vez establecido dicho uso, solo podrá ser variado mediante el consentimiento unánime de los titulares. Por ello, el Artículo 2 de la Ley núm. 129-2020, 31 LPRA sec. 1291, dispone que "[l]a escritura que establezca el régimen de propiedad horizontal expresará clara y precisamente el destino y uso de toda área comprendida en el inmueble, y, excepto que esta ley autorice lo contrario, una vez fijado dicho destino y uso, solo podrá ser variado mediante consentimiento unánime de los titulares".

Los términos consignados en la escritura matriz gobiernan al régimen siempre que sus disposiciones no sean contrarias a la ley, la moral o el orden público. *Consejo de Titulares Cond. McKinley Court v. Rullán*, supra; Arce v. *Caribbean Home Const. Corp.*, 108 DPR 225 (1975); *Consejo de Titulares v. Vargas*, 101 DPR 579 (1973). Así, la escritura matriz de una propiedad por pisos o apartamentos individuales es la fuente vinculante más importante para los condóminos, luego de la ley. M. J. Godreau, *El Condominio: El Régimen de Propiedad en Puerto Rico*, San Juan, Editorial Dictum, 1992, a la pág. 71. En la escritura matriz, se expresará claramente el destino dado al inmueble y a cada uno de sus apartamentos y la descripción de los elementos comunes limitados a cierto número de apartamentos. **Dicha escritura constituye un estatuto privado, al cual se adhieren los titulares cuando compran sus respectivos apartamentos, y que gobierna a los condóminos o titulares** y a cuyas disposiciones deben acudir los tribunales para dirimir cualquier conflicto, a menos que tales disposiciones violen le ley, la moral o el orden público. *Brown III v. Junta de Directores Cond. Playa*

*Grande,* 154 DPR 225 (2001). El Reglamento sobre Condominios promulgado por el DACo y los planos del condominio son otras de las fuentes principales de obligaciones y derechos que regulan el régimen de propiedad horizontal.

Por otro lado, los titulares de los apartamentos están obligados a contribuir proporcionalmente a los gastos para la administración, conservación y reparación de los elementos comunes generales. Artículo 59 de la Ley núm. 129-2020, 31 LPRA sec. 1923d. A su vez, dicho artículo dispone que:

> La cantidad proporcional con que debe contribuir cada titular a los gastos comunes se determinará, fijará e impondrá al principio de cada año calendario o fiscal y vencerá y será pagadera en plazos mensuales. Cada plazo vence el primer día de cada mes. La administración podrá cobrar una penalidad del diez por ciento (10%) de la cuota impagada si transcurren quince (15) días del vencimiento de la mensualidad. [...] Si la falta de pago excede de tres (3) o más plazos, podrá conllevar una penalidad adicional equivalente al uno por ciento (1%) mensual del total adeudado. La Junta de Directores no está obligada a recibir pagos parciales.
>
> **La deuda de un titular por concepto de cuotas de mantenimiento para gastos comunes se le podrá reclamar judicialmente luego de ser requerido de pago mediante correo certificado con acuse de recibo y de éste no cumplir el pago en el plazo de vencimiento**. (Énfasis nuestro)

De esta forma, la Ley núm. 129-2020 faculta al Consejo de Titulares al cobro de cuotas de mantenimiento y otros gastos comunes. Igual, permite la imposición de penalidades e intereses y reclamar por la vía judicial.

En el Artículo 39 del estatuto, 31 LPRA sec. 1922k, inciso (b)(6), se preceptúa que:

> Todo titular deberá contribuir con arreglo al porcentaje de participación fijado a su apartamento en la escritura de constitución, y a lo especialmente establecido, conforme al inciso (f) del Artículo 49 de esta Ley, a los gastos comunes para el adecuado sostenimiento del inmueble, sus servicios, tributos, cargas y responsabilidades, incluidas las derramas, primas de seguros, el fondo de reserva, o cualquier otro gasto debidamente aprobado por el Consejo de Titulares.

De esta manera, queda bastante clara la obligación de los condómines en el pago de cuotas de mantenimiento de áreas

comunes para el adecuado sostenimiento del inmueble, sus servicios, tributos, cargas y responsabilidades, incluidas las derramas, primas de seguros, el fondo de reserva, o cualquier otro gasto debidamente aprobado por el Consejo de Titulares.

Incluso, en reiteradas ocasiones, el Tribunal Supremo ha establecido la importancia de la cuota de mantenimiento, definiéndola como esencial para la sostenibilidad y funcionamiento del régimen de Propiedad Horizontal. *Asoc. C. Quadrangle Med. Ctr. v. Ramírez,* 154 DPR 699, 711 (2001).

Corolario de lo antes expuesto, como parte de la importancia del pago de las cuotas de mantenimiento y la sostenibilidad de la propiedad horizontal, el precitado Artículo 59 de la Ley de Condominios, también establece que:

> La Junta de Directores **podrá ordenar la suspensión del servicio de agua potable, electricidad, gas, teléfono,** así como los servicios de transmisión de voz, video y data, y/o cualquier otro servicio similar, **cuando el suministro de éstos llega por medio de instalaciones que constituyen elementos comunes generales del inmueble, a aquellos titulares que adeuden dos (2) o más plazos de cuotas, cuotas especiales, derramas, multas con pago vencido de sesenta (60) días o más**, o alguna prima vencida del seguro comunal por cualquiera de los apartamentos de los que sea titular. No se suspenderá ningún servicio, a menos que medie una notificación al titular por los medios establecidos en esta Ley, la cual deberá realizarse con no menos de quince (15) días de anticipación.
>
> Sin embargo, antes de la suspensión del servicio será obligación de la Junta de Directores junto con el titular, evaluar dentro de los quince (15) días de notificación del corte, un plan de pago en aquellos casos en que el titular demuestre que ha mediado o acontecido un evento que ha tenido el efecto de mermar sus ingresos o capacidad de pago. El primer incumplimiento de dicho plan de pago, tendrá la consecuencia del corte del servicio sin notificación previa. No se restituirán dichos servicios hasta el pago total de lo adeudado o del cumplimiento del plan de pago. [Énfasis nuestro]

Por su parte, sobre la facultad de la Junta de Directores para suspender los servicios, el Reglamento Núm. 9386 del 16 de agosto de 2020 intitulado *Reglamento de Condominios* (Reglamento Núm. 9386), en la Regla 28 indica lo siguiente:

> I.  El Director o la Junta de Directores podrá ordenar la suspensión del servicio de agua potable, electricidad,

gas, teléfono, así como los servicios de transmisión de voz, video y data y/o cualquier otro servicio similar, cuando el suministro de estos llega por medio de instalaciones que constituyen elementos comunes generales del inmueble, únicamente bajo los términos o escenarios contemplados en la ley. Es decir, a aquellos titulares que adeuden dos (2) o más plazos de cuotas, cuotas especiales, derramas, multas con pago vencido de sesenta (60) días o más, o alguna prima vencida del seguro comunal por cualquiera de los apartamentos de los que sea titular. No se suspenderá ningún servicio, a menos que medie una notificación al titular por los medios establecidos en la Ley, la cual deberá realizarse con no menos de quince (15) días de anticipación.

II. En aquellos casos en que dentro del término de quince (15) días de la notificación de la suspensión el titular demostrase que ha mediado o acontecido un evento que haya tenido el efecto de mermar sus ingresos o capacidad de pago, este junto a la Junta de Directores evaluaran un plan de pago. El titular podrá demostrar la disminución de ingresos o incapacidad de pago, utilizando cualquier documentación acreditativa, incluyendo, pero sin limitarse a una declaración jurada que detalle el evento junta con la evidencia correspondiente.

III. La solicitud del plan de pago paralizara la suspensión del servicio. Cuando la Junta de Directores no logre un acuerdo con el titular, deberá poner por escrito y de manera fundamentada las razones para denegarle el plan de pago. En este caso, el titular podrá agotar el procedimiento expedite esbozado en la Regla 29 de este Reglamento. La paralización quedara en efecto hasta tanto se adjudique la querella.

IV. El incumplimiento con el plan de pago, tendrá como consecuencia el corte del servicio sin notificación previa. No se restituirán dichos servicios hasta tanto se proporcione el pago total de la deuda o el cumplimiento del plan de pago.

V. El Secretario podrá paralizar la suspensión de los servicios esbozados en esta regla siempre que se trate de un apartamento para uso residencial, cuando:

(1) En virtud de una Orden Ejecutiva emitida por el Gobernador, se declare un estado de emergencia por desastre natural o pandemia mientras esta subsista.

(2) El titular acredite a la Junta de Directores con prueba fehaciente, previo a la suspensión del servicio, que el o algún otro residente del apartamento utiliza algún equipo para el sostenimiento de su vida. En dicho caso, se paralizará temporeramente la suspensión del servicio requerido para la operación del mismo. El titular vendrá obligado a presentar y acordar con la Junta de Directores un plan de pago para satisfacer en su totalidad la deuda vencida

**III.**

En esencia, los apelantes señalaron que erró el TPI al desestimar la Reconvención amparado en que tanto el contador de

la AAA como el de la AEE, los cuales están a su nombre, se encuentran dentro de la propiedad y cuyas facturas son pagadas por ellos, son elementos comunes del Condominio Villas de Paseosol.

Asimismo, plantearon que el foro primario incidió al determinar que el Consejo tenía la autoridad para interferir con el contador de energía eléctrica (o el de agua) ubicados en su residencia, los cuales, no son ni nunca han sido desde el 1997, "elementos comunes generales del inmueble".

De entrada, resolvemos que las mociones presentadas por las partes cumplen con las formalidades procesales dispuestas en la Regla 36 de las de Procedimiento Civil, *supra*. Por lo que, nos corresponde determinar, si en efecto, existe alguna controversia sustancial de hechos esenciales que ameriten la celebración de un juicio plenario, y si el derecho se aplicó correctamente.

De los hechos incontrovertidos detallados por el foro primario en el dictamen apelado, y en lo pertinente, destacamos los siguientes:

- Conforme a la Escritura núm. 348 intitulada *Escritura Matriz Estableciendo Régimen de Propiedad Horizontal del Condominio Villas de Paseosol* (*Escritura Matriz*) otorgada el 22 de agosto de 1994 ante el Notario Lcdo. Edwin Rosa Noya, y como dice el título, se sometió las villas a dicha forma titular;

- el 1 de diciembre de 1997, los apelantes adquirieron la Villa 19-B del Edificio 4 del Condominio mediante la Escritura núm. 6 sobre Compraventa otorgada ante el Notario Lcdo. Carlos A. Vilches López;

- los apelantes se convirtieron en miembros del Consejo de Titulares en el momento en que adquirieron la Villa 19-B del Condominio;

- **cuando los apelantes adquirieron la Villa 19-B del Condominio, se obligaron a contribuir proporcionalmente a los gastos para la administración, conservación y reparación de los elementos comunes generales del Condominio, así como a los gastos del seguro de las facilidades comunes**, según preceptúa el Artículo 99 del *Reglamento del Condominio*;

- en la *Escritura Matriz* se dispuso que el proyecto Villas de Paseosol se sometió a la "Ley de Propiedad Horizontal y cualesquiera otras leyes sobre la materia, y lo organiza en un Régimen de Propiedad Horizontal,

el cual se regirá por las disposiciones de dichas leyes, por esta escritura y por lo dispuesto en el Reglamento, el cual se hace formar parte de esta escritura como Anejo A, y por los acuerdos válidos que puedan ser adoptados por el Consejo de Titulares y la Junta de Directores del Condominio";

- **conforme con el acápite Décimo Sexto de la *Escritura Matriz* se consideran elementos comunes generales del Condominio, en lo aquí concerniente, los conectores para los servicios públicos de agua, luz, alcantarillados, teléfonos y Cable TV**;

- **los apelantes dejaron de satisfacer las cuotas de mantenimiento**;

- el *Reglamento del Condominio* regula todos los asuntos relacionados al pago de las cuotas y el corte de servicio;

- la Junta de Directores del Condominio, según se dispone en el Artículo 63 del *Reglamento del Condominio*, tiene entre sus deberes y facultades: (a) tender todo lo relacionado con el buen gobierno, administración, vigilancia y funcionamiento del Régimen y en especial lo relativo a las costas y elementos de uso común y los servicios generales, y hacer a estos efectos las oportunas advertencias y apercibimientos a los titulares; (b) Cumplir y hacer cumplir las disposiciones de la Ley de Condominios de Puerto Rico, el Reglamento, la Escritura Matriz y los acuerdos del Consejo de Titulares; y (c) Ordenar que se suspendan los servicios recibidos a través o por medio de los elementos comunes generales, incluidos los servicios de agua, gas, electricidad, teléfono, internet y/o cualquier otro servicio similar a éstos, a aquellos condóminos morosos, conforme lo requerido por ley;

- el 13 de marzo de 2022, mediante correo electrónico Doris Rosales, representante Property Collector & Access informó que estaría realizando la desconexión de los servicios el 16 de mayo de 2022;

- el 18 de agosto de 2022, mediante correo electrónico Jailienid Olmo, representante de Property Collector Access informó que se rompió una parte del contador de energía eléctrica para activar la luz; y

- según la factura núm. 2024-19 emitida el 11 de abril de 2024 por el Consejo de Titulares, desde julio de 2021, los apelantes han incumplido con su obligación de satisfacer las cuotas de mantenimiento de la Villa 19-B del Condominio, incluyendo las penalidades establecidas en el Artículo 59 de la Ley Núm. 129-2020.

Conforme a estas determinaciones de hechos y las restantes consignadas en la *Sentencia Parcial* impugnada, las cuales no fueron refutadas por los apelantes en el recurso ante nos[20], el TPI razonó que el conector de servicio público de electricidad se

---

[20] Advertimos que según señala el Consejo en la oposición, los apelantes utilizaron en la discusión de los errores parte de la Contestación a Pliego de Interrogatorios y Producción de Documentos del 16 de octubre de 2024 y del 20 de diciembre de 2024, que fuera anejado como Apéndice II al recurso por estos, documento que se dio por no puesto mediante nuestra *Resolución* del 30 de abril de 2026.

identificó como un elemento común general del Condominio, al igual que la parcela de terreno donde enclava el complejo, así como las paredes maestras y de cargas, tanto internas como externas. Por lo que, precisó, que aun cuando el servicio de energía eléctrica se le brinda de manera particularizada a la propiedad de los apelantes, reconoció diáfanamente que para que se disfrute del servicio, se requiere que el conector de luz, considerado un elemento común general del Condominio, suministre a estos la energía que servirá a su propiedad a través del contador de la AEE.

Así pues, determinó que la Junta de Directores del Condominio tenía autoridad para suspenderle los servicios de energía eléctrica y su intervención no fue ilegal. En este punto, acentuó que la *Ley de Condominios, supra,* y el Reglamento del Condominio Villas de Paseosol faculta a la Junta de Directores a ordenar la suspensión de la desconexión de los servicios cuando hay incumplimiento en el pago de cuotas de mantenimientos y los servicios de los cuales se sirven los titulares son suministrados por medio de instalaciones consideradas elementos comunes generales del inmueble.

Por tanto, el TPI concluyó correctamente que resulta improcedente la reclamación por daños instada por los apelantes. Recordemos que para que se prospere un reclamo de daños uno de los elementos que se tiene que configurar es que el actor del evento realice un acto u omisión culposo o negligente. Artículo 1536 del Código Civil de 2020, 31 LPRA sec. 10801. En este sentido, reiteramos que, ante los hechos incuestionables de que los apelantes al adquirir la Villa 19-B del Condominio, se obligaron a contribuir proporcionalmente a los gastos para la administración, conservación y reparación de los elementos comunes generales del Condominio, así como a los gastos del seguro de las facilidades comunes, y que estos dejaron de satisfacer los pagos

correspondientes, la Junta de Directores tenía la facultad legal y reglamentaria para ordenar la suspensión de los servicios.

Al respecto, enfatizamos que la Ley núm. 129-2000, el *Reglamento del Condominio,* así como el Reglamento Núm. 9386 facultan a la Junta de Directores a ordenar que se suspendan los servicios recibidos a través o por medio de los elementos comunes generales, incluidos los servicios de agua, gas, electricidad, teléfono, internet o cualquier otro servicio similar a éstos, a aquellos condómines morosos, conforme lo requerido por ley. De igual manera, la Ley núm. 129-2020, reconoce a la Junta de Directores, la potestad de ordenar la suspensión del servicio de agua potable y electricidad, a aquellos titulares que adeuden dos (2) o más plazos de cuotas. Artículo 59 de la Ley núm. 129-2000, *supra.*

A base de lo anterior, reiteramos que la Junta de Directores procedió a cortar el servicio de manera legal, al estar autorizada para ello y, en consecuencia, coincidimos con el foro *a quo* al resolver que no procede reclamar daños por sus actuaciones según fuera solicitado en la *Reconvención* instada por los apelantes.

Añadimos a lo antedicho que, acorde con la jurisprudencia previamente reseñada, **la escritura matriz constituye un estatuto privado, al cual se adhieren los titulares cuando compran sus respectivos apartamentos, y que gobierna a los condóminos o titulares**. También precisa subrayar que el Artículo 59 de la Ley núm. 129-2020, *supra,* establece que los titulares de los apartamentos están obligados a contribuir proporcionalmente a los gastos para la administración, conservación y reparación de los elementos comunes generales.

Por último, se hace importante apuntalar que los apelantes ignoran por completo en su discusión que en la **Cláusula Vigésimo**

**Primero** de la *Escritura Matriz* se dispone patentemente, en lo aquí correspondiente, que:

- **todos los dueños o futuros dueños del Condominio en cualquier forma o manera estarán sujetos a las disposiciones de esta escritura y del Reglamento del Condominio y <u>la mera compra o adquisición de una de las villas significará que las disposiciones de esta escritura y del Reglamento del Condominio han sido aceptadas y ratificadas y el incumplimiento de cualquiera de esas disposiciones será motivo suficiente para que el Consejo de Titulares del Condominio pueda incoar las acciones judiciales para reclamar compensación por cualesquiera daños causados y exigir el cumplimiento estricto de las disposiciones de esta escritura y del Reglamento del Condominio, y de cualquier otra regla o norma legalmente adoptada por el Consejo de Titulares</u>**.
- **ningún titular de una villa de este condominio estará exento de la responsabilidad de contribuir con la parte que le corresponda en los gastos comunales del Condominio por renunciar al uso o disfrute de cualquiera o todos los elementos comunes generales o restringidos**.

En fin, de la simple lectura de dicha disposición resulta forzoso colegir que los apelantes con la compra de la villa en el Condominio **aceptaron y ratificaron** todas que las disposiciones de la *Escritura Matriz* y del *Reglamento del Condominio,* las que incluyen la descripción de los elementos comunes generales, satisfacer los pagos de las cuotas de mantenimiento y otros conceptos, y consentir que la Junta de Directores ejecute los actos necesarios para hacer cumplir las disposiciones de la Ley de Condominios de Puerto Rico, el Reglamento, la *Escritura Matriz,* así como los acuerdos del Consejo de Titulares, entre los que se encuentra, la autorización para el corte de servicios a los condómines deudores. Por ello, la Junta de Directores no incurrió en actos culposos ni negligentes que generaran un daño a los apelantes. Más bien, solo ejecutó los deberes y facultades legales y reglamentarias adscritas como organismo rector del Condominio Villas de Paseosol.

Por consiguiente, el TPI no cometió los errores imputados.

**IV.**

Por los fundamentos antes expuestos, procede confirmar la *Sentencia Parcial* apelada.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones